TATTERSFIELD, Appellant, v. INDEPENDENT SCHOOL DISTRICT OF FLANDREAU, Respondent.

(245 N. W. 51.)

(File No. 6853.   Opinion filed November 1, 1932.)

*Danforth & Davenport,* of Sioux Falls, for Appellant.
*Rice & Rice,* of Flandreau, for Respondent.

CAMPBELL, P. J.   This case arises indirectly from the transactions between Tattersfield, plaintiff herein, and Moody County Bank which were presented to this court by the cases of Tattersfield v. Smith, 60 S. D. 471, 245 N. W. 44, No. 6838, and Smith v. Tattersfield, 60 S. D. 466, 245 N. W. 49, No. 6999, opinions this day filed.   The Moody County Bank was closed for liquidation by the superintendent of banks May 22, 1926.   Since some time in February, 1926, the bank had been indebted to Tattersfield in the sum

of $6,994.15 upon general deposit, and on April 23, 1926, the bank indorsed and delivered to Tattersfield a certain school warrant in the principal sum of $3,000 issued by the independent school district of Flandreau, which was accepted and received by Tattersfield and his account with the Moody County Bank debited accordingly on May 3, 1926. Attendant facts and circumstances relating to the creation of Tattersfield's deposit account in the bank and the delivery of the school warrant to him are set out quite fully in the opinions of Tattersfield v. Smith, and Smith v. Tattersfield, above referred to.

The facts concerning the issuance of the warrant in question by the school district, and its subsequent conduct in relation thereto, appear from the record in this case to be substantially these: In 1926 one Kneebone was president of the board of education of the school district, the other members thereof being Rolfe, Meyer, Olson, and Anderson. One Pettigrew was treasurer of the board, and B. J. Francis, who was president of the Moody County Bank, was clerk of the board. It is very apparent from the record that the board of education really treated Francis, its clerk and the president of the bank, as its general fiscal agent. The Moody County Bank was the depositary of the funds of the district. If the treasurer of the district personally kept any books or paid any attention to its financial affairs, his activities in that regard seem to have been purely nominal, as he himself concedes. Tax money due to the school district was turned over by the county treasurer directly to the Moody County Bank, which would credit the money so received to the school district on its books. Warrants issued by the school district would be presented at the Moody County Bank and the bank would pay the same and treat the warrant as a voucher debited against the account of the district. The school treasurer testifies concerning the situation as follows: "The way I handled the business as Treasurer was the bank drew the money from the County Treasurer and credited my account as Treasurer and they paid the warrants against the account, that is, when the warrants were paid they charged the vouchers against my Treasurer's accounty. I drew no items against the account. As far as I know I never had anything particularly to do with the account. I was treasurer and I suppose I should have known. As far as I know I didn't know anything about it."

The Legislature of 1925, by act effective July 1, 1925 (Laws 1925, c. 87), changed the date when taxes become delinquent from April 1st to May 1st. As a result of this change, the date when public corporations could expect to receive their tax money in the year 1926 and subsequent years was correspondingly deferred. In February, 1926, the school district had on deposit in the Moody County Bank a little over $4,000. Interest on outstanding bonds of the district was due and payable March 1, 1926, in the amount of $3,007.50. It was apparent that the cash on hand was insufficient to pay this interest and also to meet the necessary current disbursements for operating expense, teachers' salaries, etc. that would accrue prior to the time (shortly after May 1, 1926) when it might be expected that tax money would be received from the county treasurer. Francis testifies that he talked this situation over with the members of the school board and told them that a warrant would have to be issued to pay the bond interest. He testifies that he told the board that the bank would have to negotiate the warrant. He states further that the warrant was originally issued in the amount of $3,007.50, and that such warrant was canceled and replaced by two warrants, one for $3,000, and one for $7.50, solely because the warrant for $3,000 even money would be easier to negotiate, and that he talked to Mr. Kneebone, the president of the board of education, about this particular point because he had Mr. Kneebone come in and sign the two warrants to replace the one originally issued, and told him at that time why he wanted the change made. Kneebone, the president of the board, says that he remembers the circumstance of signing the warrant in question. He testifies that he does not think Francis said anything about selling the warrant, but he also testifies that Francis stated that "he would use it for collateral to get sufficient funds to tide us over thirty or sixty day period until we could get this money from the County Treasurer." Of course, if he knew the warrant was to be used as collateral, he must have known that the bank did not expect to retain unqualified title thereto or possession thereof but intended to pledge it to secure money. Mr. Kneebone says that he does not recall the original warrant of $3,007.50 being canceled and the two warrants for $3,000 and $7.50 issued, but that it is entirely possible that this occurred. The attention of the other board members to the transaction and their knowledge concerning it is

fairly indicated by the testimony of the member Rolfe, who says: "I knew we had been short and the president had been authorized to make a loan to take care of some business of the board. * * * I knew, of course, that interest was coming due on the school bonds. I think the amount of this interest was about $3,000.00 and that was one of the items to be taken care of. * * * The matter of the handling of the warrant was left to Mr. Kneebone and Mr. Francis, I think."

The warrant was issued and delivered to the Moody County Bank on February 26, 1926, and on the same day was indorsed by the treasurer of the school district over his signature, "Presented for payment and not paid for want of funds this 26th day of February, 1926." As a matter of fact, on that date the school district had on deposit in the bank something over $4,000, as previously stated. Upon receipt of the warrant the Moody County Bank paid the amount thereof out of its own funds directly to the holders of bond interest coupons. As set forth in the opinion in Tattersfield v. Smith, 60 S. D. 471, 245 N. W. 44, No. 6838, previously referred to, the warrant in question was mailed by Francis, president of the bank and clerk of the school board, to Tattersfield on April 23, 1926, and on May 3, 1926, the account of Tattersfield with the Moody County Bank was debited with the full amount of the warrant, to wit, $3,000. The deposit balance of the school district in the bank at the time the warrant was indorsed and delivered to Tattersfield was $3,126.01, which was subsequently reduced by expenditures of the school district in the payment of valid obligations against it until on May 13, 1926, such balance was down to $14. On that date tax money in the amount of something over $11,000 came in and was deposited in the bank to the credit of the school district. Thereafter the deposit account was depleted by further withdrawals and expenditures in payment of valid obligations, until at the time the bank closed the deposit balance of the school district was $8,953.20. So far as concerns actual knowledge of the members of the school board of the transfer of the warrant to Tattersfield, they are quite indefinite. A fair example of their testimony in this regard is that of the member Meyer, who says: "I don't think that I knew Mr. Tattersfield had this warrant before the closing of the Moody County Bank. I can't fix any date when I learned of it. I can't really say Mr. Francis told me, but I knew

of it sometime that it had been transferred but I couldn't say Mr. Francis told me, or just where I learned of it." All of them seem to entertain the opinion that they learned of the transfer a month or so after the bank closed. Francis states that he told them he had sold the warrant and that they knew it, but he is not certain whether he told them before or after closing of the bank. As previously recited, however, the testimony of Francis is that when the matter of issuing the warrant was discussed he told them that the bank would not carry the warrant itself and would have to negotiate it if possible, and in this he is corroborated by the testimony of Kneebone, the only board member who appears to have really known anything about the matter or paid any attention to it save only that Kneebone's understanding was that the warrant would be put up as collateral.

It is clear, in any event, that all members of the board knew of the transfer to Tattersfield shortly after the closing of the bank, which occurred on May 22, 1926. On October 11, 1926, the school district filed a claim with the superintendent of banks in charge of the Moody County Bank for the full amount of its deposit balance at the date of closing of the bank, to wit, $8,953.20, swearing that there were no offsets against the same, on which claim it later received several dividends computed on the full amount thereof. About a year and a half after the closing of the Moody County Bank, the board of education of the district passed a resolution providing for the payment of the warrant in question, and on September 10, 1927, the clerk of the board wrote to Tattersfield with reference to the warrant, stating: "Referring to our exchange of letters in regard to our School Warrant No. 10707, which you hold; we wish to ask that you send the same to the First National Bank of Flandreau, S. D., for collection and upon receipt of same we will remit at your order. Thanking you for your accommodation for this length of time, we are." Tattersfield promptly forwarded the warrant as requested, but the board of education rescinded its resolution for the payment thereof, refused to pay it, and it was returned to Tattersfield, who immediately instituted this action to recover thereon.

In this action the school district sought to offset against the warrant the amount of its deposit claim against the Moody County

Bank which (excepting only as to $14 thereof) accrued as the result of the deposit made by the school district on May·11, 1926, some time after the transfer of the warrant in question to Tattersfield. At the trial the school district offered to allow the plaintiff to be subrogated to the extent of $3,000 to the claim for $8,953.20 which it had filed as a deposit creditor of the Moody County Bank, and tendered to him pro rata the dividends it had received thereon.

Findings, conclusions, and judgment below were in favor of plaintiff Tattersfield upon all the issues adjudging payment of the warrant in full.ˉ Thereafter, on application of defendant school district, a new trial was granted; the reasons of the court being set forth in the ·following language: "And the court being satisfied that it erred in the decision of said action and particularly that the court erred in failing to find as requested by said defendant that the warrant described in plaintiff's complaint was transferred to the plaintiff while the said ·Moody County Bank of Flandreau, South Dakota, was insolvent and with knowledge and notice on the part of said plaintiff of the insolvency of said bank and with the intention on the part of said bank and its officers to· grant to said plaintiff as a creditor thereof an unlawful preference and with the intent on the part of said plaintiff in receiving such warrant that he be preferred as one of the creditors of said bank, and the court further being of the opinion that it erred in finding that said warrant was issued with the understanding and agreement between the said defendant and the Moody County Bank that said warrant should ·be sold and transferred by said ·bank for the purpose of raising funds for the purpose of financing said school district, and that the court further erred in finding that defendant had notice or knowledge of the transfer of such warrant to the plaintiff by said bank; and that the court further erred in failing to find that upon the trial of this action the defendant in open court offered to repay to the plaintiff the dividends received on the share of its claim to which the said Tattersfield would ·be entitled on account of the transfer of said school warrant, and that the said Tattersfield, plaintiff herein, be subrogated to the rights of the defendant to the extent of the amount of defendant's off-set on account of the transfer of said warrant and that defendant is not estopped from asserting an off-set to said warrant on account of the funds deposited by it in said bank; and that the court further erred ˙in

making finding of fact No. XV that said transaction on the part of the plaintiff was in good faith and that the court should have found that plaintiff had the possession of said warrant and its title and its rights therein were subject to the equities of this defendant and subject to the rights of the defendant to an off-set of the amount of its deposit in said bank against the liability on such warrant; and the court being further of the opinion that before a new trial of this action that the said Moody County Bank should be impleaded as a party defendant." From the order granting new trial plaintiff Tattersfield has now appealed to this court.

In support of the granting of the new trial, respondent urges that the warrant was issued without authority of law, since the school district had no authority to borrow money and the treasurer had no power to indorse the same as presented and not paid for want of funds, when, as a matter of fact, the cash on hand of the district at that time was appreciably more than the face of the warrant. In that connection it may be said, as reiterated by this court in Slagle & Co. v. Elk Point Ind. Consol. School Dist (1918) 40 S. D. 73, 166 N. W. 234, 235, that: "The doctrine of ultra vires does not absolve municipal corporations from the principles of common honesty." It was certainly the duty and within the power of the board to pay interest maturing on its outstanding bonds. The transaction in question, regardless of what the board members may have called it, did not amount by any necessity to a borrowing of money by the district. The district, owing bond interest, could and should issue warrants for the amount thereof against its interest and sinking funds (the existence of which must be assumed). If the funds had insufficient money to cash the warrants (and in fact whether there was sufficient money in the funds or not), the warrant holders could negotiate the warrants to the bank, and the bank could advance its funds thereon. That was the substance of what was done. Instead of expecting bondholders to carry the warrants for interest until funds of the district were available to pay the same (unless they could earlier negotiate them), the bank voluntarily assumed this burden, with equal privilege of negotiation. That was the object of issuing the warrant, which recites on its face that it is "for interest on bonds." As a result of the issuance and delivery of this $3,000 warrant, the Moody County Bank paid bond interest, which was a valid obli-

gation of the school district, out of its own funds in an equivalent amount. The district still retains that benefit and will not be heard under these circumstances to urge the irregularity or illegality of the warrant.

We come now to determine the right of the board to the claimed offset against the warrant in the hands of appellant. Excepting only to the extent of $14, as previously pointed out, the offset originated with a deposit made subsequent to the indorsement and transfer to appellant. Let us first consider this point, assuming that appellant was an indorsee of the warrant in good faith and for full value beyond possibility of question. Clearly the warrant in question is not a negotiable promissory note or bill of exchange. It is, however, a thing in action, and it is also a nonnegotiable written contract for the payment of money. Sections 2307 and 742, Rev. Code 1919, read respectively as follows:

"In case of an assignment of a thing in action, the action by the assignee shall be without prejudice to any setoff or other defense existing at the time of, or before notice of, the assignment; but this section shall not apply to a negotiable promissory note or bill of exchange, transferred in good faith, and upon good consideration, before due."

"A non-negotiable written contract for the payment of money or personal property may be transferred by indorsement, in like manner with negotiable instruments. Such indorsement shall transfer all the rights of the assignor under the instrument to the assignee, subject to all equities and defenses existing in favor of the maker at the time of the indorsement."

In view of these two sections it may be open for argument whether, as against the indorsee and holder of a nonnegotiable written contract for the payment of money, the maker thereof may urge offsets existing at any time up to notice of the assignment, or whether he is limited to offsets which existed at the time of the assignment regardless of the time of his notice thereof. Possibly this court has not always been entirely consistent in dealing with these sections. See Kirby v. Jameson (1896) 9 S. D. 8, 67 N. W. 854; State Bk. v. Hayes (1902) 16 S. D. 365, 92 N. W. 1068; Barry v. Stover (1906) 20 S. D. 459, 107 N. W. 672, 129 Am. St. Rep. 941; Floete Lbr. Co. v. Doherty (1923) 46 S. D. 326, 192 N. W. 751.

█ However, we do not think we are called upon in this case to construe these two sections with reference to the point suggested. It is very clear that it was understood and intended at the time this warrant was issued that the bank would part with it as soon as possible (whether by sale or pleading as collateral is not material) to some third person for value for the purpose of securing or recouping the money advanced by the bank on the faith of the warrant in payment of bond interest for the district. It is clear also that this school board practically left the entire handling of its financial affairs to its clerk Francis. Francis knew of the indorsement and transfer of this warrant to appellant at the moment it was made. He was not only an officer of the school district, but was the very officer to whom the other officers, as a matter of fact, intrusted the handling of its financial affairs. Under the circumstances here appearing, we are of the opinion that knowledge of the clerk Francis was knowledge of the school district, and therefore notice of the indorsement to Tattersfield on the part of the school district existed from and after the making of the indorsement, and it is immaterial whether the district's right to set-off be deemed governed by section 2307 or section 742.

█ We arrive then at the question of how this situation may be affected by the manner and circumstances of appellant's acquisition of the warrant, and here we reach the point which is chiefly argued in the briefs and which seems largely to have motivated the granting of the new trial. The contention of respondent in this regard is stated in its brief in the following language:

"1. That plaintiff is not the owner of the warrant sued upon and therefore plaintiff cannot recover because:

"(a) He is not the real party in interest, this being the Moody County Bank.

"(b) If plaintiff has any title it is a naked legal title and he holds it subject to all equities and defences including off-sets which defendant has against the bank."

This contention is bottomed upon the so-called "trust fund doctrine" which we have recently had occasion to consider in the case of Smith v. McCowan, 60 S. D. 504, 244 N. W. 891, opinion this day filed. Respondent urges that because of the insolvency of the Moody County Bank when this warrant was indorsed to Tattersfield, its assets constituted a trust for its creditors, and its

officers were therefore powerless to transfer title to any of such assets to any of its creditors, or at most could transfer only a naked legal title, the real ownership continuing in the insolvent bank, and respondent therefore argues that appellant cannot be the real party in interest under section 2307, Rev. Code 1919. As we pointed out in Smith v. McCowan, supra, we are not willing at the present time to recede from the position adopted by this court some thirty-seven years ago and hold that an insolvent corporation is as much at liberty to prefer one creditor over another as is a natural person. We also pointed out in Smith v. McCowan, however, that while the language of trust has been used by this and other courts in dealing with the matter of preferences by insolvent corporations, nevertheless the situation is not in any true or complete sense a trust situation. In the instant case, if the bank had been solvent when the warrant was transferred to appellant, there would be no question but that he was a good-faith holder for full value. It is not claimed that the warrant was indorsed to Tattersfield for the purpose of defeating any rights of the school district, and the rights upon which the school district now stands, excepting only to the extent of $14, originated subsequently to the transfer. It is not claimed that Tattersfield had knowledge of any equities or defenses against the warrant and none are here urged save only the matter of offset. When Tattersfield took the warrant he discharged pro tanto a valid claim against his assignor which was ample consideration. The only vice which could inhere in the taking of Tattersfield arose solely by reason of the fact that because of the then insolvent condition of his assignor he, as an existent creditor, though paying full consideration as between his assignor and himself, might receive a larger share of his assignor's assets than other creditors equally thereto entitled. We think, however, that as against all persons excepting the creditors of Moody County Bank, the transfer of the warrant in question to Tattersfield was good and that it is not subject to the collateral attack attempted in this case. The transfer was not void but was voidable only at the instance of creditors. Unless and until creditors avoid the transaction as preferential, it is good as against every one else. The superintendent of banks appears to have made no effort to set aside the transfer of this school warrant (as he did in the case of a note and mortgage transferred at the same time, dealt with in Smith v. Tatters-

field, 60 S. D. 466, 245 N. W. 49, No. 6999, opinion this day filed). It is suggested that if appellant recovers on the warrant the superintendent of banks will then proceed against him to recover the proceeds and thus circuitously defeat the claim of respondent school district to offset its deposit claim against any claim asserted on the warrant by the bank or the liquidation authorities. No such thing could be done. Equity would not permit the liquidation authorities of the Moody County Bank, with full knowledge of the transfer of this warrant to Tattersfield, to stand by without in any manner attacking the transfer until after Tattersfield had collected the proceeds of the warrant which the bank itself could not have collected because of the claim of off-set and then take those proceeds from him. Under the circumstances of this case, and in view of the failure of the creditors of Moody County Bank to attack the transfer of this warrant to appellant, notwithstanding their full knowledge concerning it, if appellant does recover upon the warrant he will be entitled to retain the fruits of his recovery.

We are of the opinion that the mere fact that the transfer of this warrant to appellant may have been preferential as against other creditors of Moody County Bank is not sufficient, standing alone, to prevent appellant from acquiring title to the warrant or to prevent appellant from being the real party in interest in this lawsuit, or to justify the assertion against appellant of a set-off which may have been good against the Moody County Bank, but which did not originate until after the indorsement and transfer to the appellant and after the respondent was chargeable with notice thereof.

We think, therefore, that the learned trial judge erred in granting a new trial, and the order appealed from is reversed, and the cause remanded to the circuit court, with instructions to enter judgment in favor of appellant and against respondent upon the original findings and conclusions as prayed in the complaint, modifying the same, however, by reducing it by the sum of $14, the greatest amount of respondent's deposit claim against the Moody County Bank that can be held to have originated prior to the indorsement and transfer of the warrant in question to appellant.

POLLEY and ROBERTS, JJ., concur.

WARREN and RUDOLPH, JJ., deeming themselves disqualified, not sitting.